# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

vs.                                                                              No. CIV 02-1644 JB/RHS

BCI COCA-COLA BOTTLING COMPANY
OF LOS ANGELES,
d/b/a PHOENIX COCA-COLA BOTTLING
COMPANY and COCA-COLA BOTTLING
COMPANY OF ALBUQUERQUE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment,
filed February 19, 2004 (Doc. 65). The primary issue is whether the Plaintiff Equal Employment
Opportunity Commission ("EEOC") has demonstrated that there is a genuine issue of material fact
whether Defendant BCI Coca-Cola Bottling Company of Los Angeles ("BCI") terminated Stephen
Peters from his employment because he is African American. Because the Court finds that the EEOC
has not established a genuine issue of material fact, it will grant BCI's Motion for Summary Judgment
and dismiss the EEOC's claims.

## FACTUAL BACKGROUND

BCI is a wholly owned subsidiary of Coca-Cola Enterprises, Inc., the world's largest bottler
of Coca-Cola® products. See Declaration of Patricia K. Edgar ¶ 2, at 1-2 (executed February 2,
2004). BCI does business in Albuquerque as the Coca-Cola Bottling Company of Albuquerque. See
id. Peters worked as a merchandiser in the Albuquerque facility under the supervision of Cesar

Grado, a District Sales Manager.  See Declaration of Cesar Grado ¶¶ 1, 5, at 1-2 (executed February 3, 2004).

Merchandisers are hourly employees whose job duties include product placement and cleaning, arranging, and rotation of displays and promotional materials in retail grocery or other outlets.  See id. ¶ 2, at 1.  Peters was one of six merchandisers working under Grado's supervision. See id.  Grado also supervised two account sales representatives or "account managers."  See id.

Account managers are salaried sales employees responsible for selling Coca-Cola products to accounts.  See id.  At all relevant times, Jeff Katt was an account manager under Grado's supervision.  See id. ¶ 7, at 3.  According to Peters, Katt supervised his day-to-day work activities. See Affidavit of Stephen Peters ¶ 9, at 2 (executed March 17, 2004).

Grado was responsible for scheduling merchandisers to cover all accounts in his territory.  See Grado Decl. ¶ 2, at 1.  Merchandisers work five days each week with two days off.  See id. ¶ 3, at 2.  Because BCI services its accounts seven days a week, none of the merchandisers had the same two days off.  See id.

Grado occasionally required merchandisers to work on their scheduled days off to provide extra coverage for routes during particularly busy times and/or when other employees are absent. See id. ¶ 4, at 2 .  An example of a busy time requiring additional coverage would be when one or more accounts is running an "ad" that is offering special prices on Coca-Cola products which results in increased volume of sales and thus requires more frequent deliveries.  Id.  When Grado needed extra help covering routes, he first requested volunteers and then asked merchandisers to come in on their days off on a rotating basis.  See id.  Peters disputes that Grado used this method to find coverage for routes.  See Peters Aff. ¶ 15, at 2-3 ("Mr. Grado just picked people to work.").

-2-

Because Peters was the most senior merchandiser under Grado's supervision, he had Saturday and Sunday as his scheduled days off.  See Grado Decl. ¶ 5, at 2.  During the first nine months of 2001, Peters worked on his days off on 8 occasions, including three Sundays and five Saturdays.  See id.  During the same 34-week period, merchandiser Frank Ortiz (Hispanic) worked on his scheduled days off 12 times, merchandiser Donald Connor (white) worked on his scheduled days off 10 times, merchandiser Arturo Lopez (Hispanic) worked on his scheduled days off 9 times, and a later hire, merchandiser Robert Espinosa (Hispanic), worked on his scheduled days off 7 times in 21 weeks.  See id.

According to Peters, he never received a written reprimand for job performance problems or attendance problems during his employment with BCI.  See Peters Aff. ¶ 1, at 1.  Peters states that he was considered a "good merchandiser" and was awarded a certificate for his five years of "service, dedication and commitment" to the company.  Id. ¶¶ 2-3, at 1.  Peters' personnel file indicates, however, that Peters' supervisor gave him a final warning for an act of insubordination which involved refusing to work on a scheduled day off.  See Disciplinary Status Notice (September 17, 1999).

Grado was responsible for monitoring the employees working under his supervision, and when an employee had an attendance, performance, and/or disciplinary issue, he was responsible for bringing the issue to the attention of the BCI Human Resources Department.  See Grado Decl. ¶ 6, at 3.  The Human Resources representative would then make a decision about which workplace policy, if any, applied to the situation and the appropriate action to take based upon what had occurred.  See id.; Deposition of Cesar Grado at 31:24 to 32:3 (taken December 3, 2003); Deposition of Sherry Pedersen at 30:19 to 31:4 (taken December 4, 2003).

The top-ranking BCI Human Resources representative at the Albuquerque facility during the relevant period was Senior Human Resources Administrator Sherry Pedersen. See Declaration of Sherry Pedersen ¶ 1, at 1 (executed February 3, 2004). With the exception of terminations, Pedersen authorized all disciplinary actions with respect to employees at the Albuquerque facility. See id. ¶ 2, at 1-2. Patricia Edgar, who was the Employee Relations Manager for BCI at all relevant times, had to authorize all terminations. See id.; Edgar Decl. ¶ 3, at 2. Edgar's office was based in Phoenix, Arizona and her responsibilities included overseeing human resource functions at BCI facilities in multiple states. See Edgar Decl. ¶ 1, at 1. At all relevant times, Pedersen reported directly to Edgar. See id.; Pedersen Decl. ¶ 1, at 1.

BCI contends that Grado did not have authority to discipline or terminate employees working under his supervision. See Grado Decl. ¶ 6, at 3. Peters contends that Grado gave employees the impression that he had the authority to fire employees. See Deposition of Jeff Katt at 71:21 to 72:13 (taken March 8, 2004); Affidavit of Michael Wilson ¶ 8, at 2-3 (executed March 12, 2004). When BCI terminated Peters' employment, Katt assumed that Grado was the one who had made the decision. See Katt Depo. at 70:24 to 71:4.

In addressing employee disciplinary issues, BCI Human Resources personnel consult written policies setting forth workplace rules and regulations, which are divided into three categories according to the severity of the infraction. See Pedersen Decl. ¶ 3, at 2. Group A violations address the most serious workplace issues, such as insubordination, and are sufficient to result in immediate discharge, although discharge is not a mandatory result. See id. Group B and C violations, on the other hand, are generally dealt with according to a progressive discipline policy, depending on the nature of the infraction. See id. Group C includes the lowest level violations, including attendance

issues.  See id.  "No call/no show" violations, which occur when an employee fails to report for a scheduled shift without notifying his or her immediate supervisor in accordance with BCI policy, are handled under a separate written policy and are not a basis for immediate termination.  Id.  BCI contends that Human Resources personnel retain discretion in applying these rules and policies, as BCI  must assess each situation on an individualized basis.  See id.

BCI Human Resources personnel uses a very specific and narrow definition of the term insubordination.

> Insubordination does not mean a situation where an employee has failed to carry out normal job responsibilities or failed to meet performance expectations.  Nor is insubordination simply failing or even refusing to follow a supervisor's instructions.  Rather, insubordination occurs when the employee knows that he is considered to be defying a direct order of the supervisor and that his conduct could lead to termination.

Edgar Decl. ¶ 9, at  4.  Peters disputes this definition, because he contends that BCI's policy does not define insubordination.   Peters also contends that there is inconsistent testimony about what constitutes insubordination.  Donald Bateluna, Grado's supervisor, testified that insubordination occurs when an employee fails to follow a direct order after being warned that failure to obey can be considered insubordination.  See Deposition of Donald R. Bateluna at 47: 8-19 (taken January 29, 2004).  Bateluna also testified that insubordination occurs when the employee follows through with his or her refusal to perform the act a supervisor has ordered him or her to do, not when the employee refuses to obey.  See id. at 48:25 to 49:9.

During the weekend of Saturday, September 29, 2001, and Sunday, September 30, 2001, three of the chain stores in Grado's area were running ads.  See Grado Decl. ¶ 7, at 3.  Accordingly, Grado needed extra merchandisers to service the accounts.  One of the merchandisers, Joseph Rivera, had previously told Grado that he had a commitment which prevented him from coming in on Sunday,

September 30, 2001.  See id.  Grado asked Katt, to relay a message to Peters that Grado needed him

to work on one of his days off that weekend.  See id.; Katt Depo. at 40:10-14.  Katt told Grado that

he did not believe Peters would be willing to work on Sunday.  See Grado Decl. ¶ 7, at 4; Katt Depo.

at 40:20-21 ("[H]e's not going to work six days this week.").  It is Grado's recollection that Katt told

him he believed Peters was going to call in sick that weekend.  See Grado Decl. ¶ 7, at 4.

Peters asserts that he never told Katt that he planned to call in sick.  See Peters Aff. ¶ 25, at

4.  Peters had worked all his scheduled days that week and had not been out sick.  See Grado Decl.

¶ 7, at 4.  Peters had not, however, been feeling well all week; Peters' plans were to go out of town

for the weekend, but because he had not been feeling well, he was going to go to the doctor and

postpone his travel plans.  See Deposition of Stephen Brian Peters at 122:12-25 (taken December 2,

2003).

On Friday, September 28, 2001, Grado learned that one of the "floater" merchandisers,

Damian Mirabal, had suffered an on-the-job injury and could not return to work for a week.  See

Grado Decl. ¶ 7, at 3.  Mirabal typically covered Peters' routes on Peters' scheduled days off.  See

id. ¶ 7, at 4.  The remaining merchandisers were already scheduled to work that weekend, except

Rivera, who was unavailable, and so Grado was now a person short and had no one left to bring in

except Peters.  See id.  Grado claims that he checked with other District Sales Managers to see if they

had anyone available to help him, but they did not.  See id.

Based on his conversation with Katt, Grado understood around mid-day on Friday, September

28, that he was going to have to require Peters to come in to work that weekend, so he decided to

seek advice from the BCI Human Resources Department.  See id. ¶ 8, at 4.  Ordinarily, Grado would

have spoken with Pedersen regarding the situation, but she was out of the office, and so he called

Edgar in Phoenix.  See id.  Grado explained to Edgar that he needed Peters to work on his day off

that weekend because of a high volume work situation and a manpower shortage, and asked whether

he could order Peters to come in to work.  See id.; Edgar Decl. ¶ 4, at 2.  Edgar asked Grado if he

had looked into every other way of getting the routes covered, and he said he had.  See Grado ¶ 8,

at 4.

Edgar told Grado he could require Peters to come in to work.  See Grado Decl. ¶ 8, at 4;

Edgar Decl. ¶ 5, at 3.  Edgar asked Grado if there were some compelling reason Peters could not

come in to work, and Grado told her that he had not spoken with Peters yet, but had heard he was

going to call in sick.  See Edgar Decl. ¶ 5, at 3.  Edgar told Grado that it was not acceptable for

Peters to plan to call in sick two days before his shift.  See id.[1]

BCI policy requires employees to call in sick to their immediate supervisor at least one-half

hour before their regular starting time on each day of absence.  See id.  BCI policy also states that

employees do not need to call in on each day of an absence if other arrangements have been made.

Edgar instructed Grado to call Peters and find out what the situation was.  See Edgar Decl. ¶ 6, at

3.

Edgar told Grado that, if he encountered resistance from Peters, unless Peters presented some

compelling reason why he could not work on the day in question, he needed to explain to Peters that

he was being given a direct order to come to work and that failure to comply with the order could

be insubordination and could lead to termination.  See Grado Decl. ¶ 8, at 4; Edgar Decl. ¶ 6, at 3.

---

[1] Peters objects that Grado's statement – "but had heard he was going to call in sick" – is inadmissible hearsay.  The Court disagrees.  BCI is not offering it for the truth of the statement, but as evidence of what Grado said to Edgar.  See Fed. R. Evid. 801(c)("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

After Grado got off the telephone with Edgar, he paged Peters, and Peters called him back.  See Grado Decl. ¶ 9, at 4.

BCI contends that Grado told Peters he needed him to work that weekend, and Peters said he could not work because he had plans.  See id. ¶ 9, at 4-5; Peters Depo. at 121:1-5.  BCI maintains that Grado asked Peters what his plans were, but Peters told Grado that his plans were none of Grado's business.  See Grado Decl. ¶ 9, at 5.  Peters denies that Grado asked him what his plans were.  See Peters Aff. ¶ 28, at 4.  Peters also claims that he told Grado he had not been feeling well all week.  See Peters Depo. at 121:5-6.

Grado then told Peters: "I'm not asking you to come to work, I'm telling you to come to work.  If you do not come to work, it could lead to insubordination and could lead to termination."  Id. at 121:11-14; Grado Decl. ¶ 9, at 5; Grado Depo. at 259:17-21.  Peters responded to Grado's statement by telling Grado: "[D]o what [you've] got to do, and I'll do what [I've] got to do."  Peters Depo. at 121:25 to 122:1; Grado Decl. ¶ 9, at 5.  While Peters does not deny that he and Grado made these statements during their telephone conversation, he insists that he was not refusing to work on Sunday, September 30.  See Peters Aff. ¶ 29, at 4.  Peters maintains that his statement to Grado was for the purpose of ending the conversation with Grado so that it would not become a confrontation.  See id. ¶ 6, at 2.  Peters also asserts that Grado never told him that his conduct during the telephone call was insubordination.  See id. ¶ 29, at 4.

After he spoke with Peters on Friday afternoon, Grado called Edgar back and told her what had happened.  Grado Decl. ¶ 10, at 5; Edgar Decl. ¶ 7, at 3-4.  Peters does not dispute that Grado told Edgar these details. At that point, Edgar believed that there was sufficient evidence to find that Peters had committed the offense of insubordination, a Group A offense subject to immediate

discharge.  See Deposition of Patricia K. Edgar at 38:12-17 (taken December 4, 2003).  Edgar states that Peters' conduct on Friday, September 28, 2001, standing alone, would have warranted termination under BCI policy.  See Edgar Decl. ¶¶ 8, 10 at 4.

At that point, Edgar understood that Peters had left for the day, because merchandisers' regular shifts usually end at 2 p.m.  See id.; Edgar Depo. at 41:20-25.  Peters disputes that he left work at 2:00 p.m., because on Friday, September 28, 2001, Peters worked over 11 hours, starting at 5:00 a.m.  See Peters Aff. ¶ 30, at 4.  In any case, Edgar told Grado they would deal with the situation on Monday.  See Edgar Decl. ¶ 10, at 4-5; Grado Decl. ¶ 10, at 5.

Because, based on his conversation with Peters, Grado believed that Peters would not be coming to work on Sunday, Grado spoke with Katt again on Friday afternoon to make arrangements to cover all the routes on Sunday.  See Grado Decl. ¶ 11, at 5; Katt Depo. at 28:3:16.  Because no merchandisers were available, Grado and Katt planned to cover the routes themselves.  See Grado Decl. ¶ 11, at 5.

Either Friday afternoon or Monday morning, Edgar spoke with Pedersen about the situation involving Peters.  See Edgar Decl. ¶ 11, at 5.  According to standard practice, Pedersen had reviewed Peters' personnel file after learning of the situation.  See id.; Pedersen Decl. ¶ 5, at 2-3.  At the hearing on this motion, BCI informed the Court that this file was located in the Albuquerque office.  See Transcript of Motion Hearing at 19:6-19 (April 7, 2004)("Transcript").[2]  The EEOC did not dispute that assertion.  Pedersen informed Edgar that Peters' personnel file contained a Disciplinary

_____

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

Status Notice related to a previous incident of insubordination in September 1999.[3]  BCI stated at

the hearing that Pedersen faxed the two page Disciplinary Status Notice to Edgar.  See Transcript

at 19:17-25.  The EEOC did not dispute that assertion.

       The 1999 incident involved a supervisor, other than Grado, who wrote Peters up for

insubordination because he refused to work on a scheduled day off.  See Disciplinary Status Notice

(1999).  BCI suspended Peters and issued him a final written warning that further instances of

insubordination could lead to termination.  See id.; Pedersen Decl. ¶ 5, at 2-3.  Grado did not

supervise Peters in 1999.  Peters disputes that he received such a final warning in 1999.  Peters Aff.

¶ 5, at 2.  BCI contends that Peters' prior similar incident with a different supervisor contributed to

Edgar's conclusion that Grado had presented an accurate account of events with respect to Peters'

conduct.  See Edgar Decl. ¶ 11, at 5; Edgar Depo. at 41:6-9.

       On Saturday, September 29, 2001, Peters went to a Presbyterian Medical Center clinic

because he was still not feeling well.  See Peters Depo. at 146:4-25.  Peters reported to the clinic staff

that he was not feeling well, including headache, sinus pain, and fatigue.  See id. at 148:6-9.  The

doctor diagnosed a sinus infection and, after Peters told her he had to go to work on Sunday, she told

him he was exhausted and overworked.  The doctor offered to write Peters an excuse from work, but

Peters told her he did not need one unless he missed 2-3 days.  The doctor did, however, give Peters

a prescription for medication.  See id. at 149:10-11; id. at 151:8-11.

       Peters called Katt on Saturday evening to tell him he was sick, he had been to the doctor, and

to request permission to stay home on Sunday.  Katt gave Peters permission and told Peters to call

---

[3] Peters objects to the admissibility of the Disciplinary Status Notice, contending that it is inadmissible hearsay.  Again, BCI is not offering the Notice as evidence of the truth about the incident in 1999, but for its influence on Edgar's state of mind.

him if for any reason he felt better in the morning.  See id. at 194:15 to 195:18.  Katt attempted to

contact Grado once or twice, but did not get a response back from Grado.  See Katt Depo. at 25:14-

23.  Katt testified that, because it was a weekend, it was not unusual for Grado not to call him back.

See id.  Because Peters was not feeling well, he stayed home on Saturday, September 29, 2001 and

Sunday, September 30, 2001.  See Peters Aff. ¶ 7, at 2; Grado Decl. ¶ 12, at 5.  After the

conversation with Grado on Friday afternoon, Peters had no further communication with Grado until

Monday, October 1, 2001.  Peters reported for work as scheduled on Monday morning, October 1,

2001.  See Grado Decl. ¶ 12, at 5.

On Monday, October 1, 2001, Edgar had at least two telephone meetings with Grado and

Pedersen to discuss the situation involving Peters.  See Edgar Decl. ¶12, at 5.  During these

conversations, Grado gave no opinion or recommendation as to what he thought should happen to

Peters.  See Grado Decl. ¶ 13, at 5; Edgar Decl. ¶ 15, at 7.[4]  Grado reported that Peters had not come

to work on Sunday, September 30, 2001, and had not attempted to contact him.  See Edgar Decl.

¶ 12, at 5.  Edgar asked Grado to check to make sure Peters had not made any attempt to contact him

over the weekend.  See id.; Grado Decl. ¶ 13, at 5.  Grado checked and confirmed that Peters had

made no attempt to contact him directly, but learned that Peters had called in sick to Katt on Saturday

night.  See Grado Decl. ¶ 13, at 6; Edgar Decl. ¶ 12, at 5-6.

By the end of the day on Monday, October 1, 2001, Edgar made the decision to terminate

Peters' employment for insubordination.  See Edgar Decl. ¶ 13, at 6.  Peters disputes that Edgar made

the decision.  Peters asserts that Grado made the decision to terminate Peters' employment and that

---

[4] Peters disputes this fact because Edgar stated at her deposition that Grado does have authority to
recommend discipline.  See Edgar Depo. at 195:24 to 196:7.  The EEOC, however, has not presented evidence
that Grado gave an opinion or recommendation during his conversations with Edgar.

Edgar authorized Grado's decision.

Edgar states that her decision was based on several factors, but first and foremost was Peters' conduct towards Grado on Friday, September 28, 2001. See id. There was no question in Edgar's mind that Peters had committed the offense of insubordination that day. See id. The prior incident of insubordination, and the final warning BCI issued to Peters in 1999, also factored into Edgar's decision to terminate his employment. See id. Edgar understood that Peters had already been given more chances than the policy required on this issue, and that any action short of termination could set a bad precedent for BCI's stance on insubordination. See id. Peters' failure to come to work on Sunday also contributed, to a lesser extent, to Edgar's decision to terminate Peters' employment, insofar it represented the continuation of the act of insubordination which Peters commenced on Friday, September 28, 2001. See id. ¶ 14, at 6.

Peters worked all day Monday from 5:00 a.m. to 5:00 p.m. and then saw Grado at a health insurance meeting on Monday evening. On Monday evening, Grado told Peters to be at the plant at 8:00 a.m. the next day, to which Peters responded "okay." Peters Depo. at 134:2 to 136:20.

At the meeting on Tuesday October 2, 2001, Grado asked Peters if he knew why he was there (in Pedersen's office), and Peters responded that he did not know. See id. at 138:7-10. Pedersen and Bateluna, Grado's supervisor, were also in present at the meeting. See id. at 137:18-24. Grado told Peters that he had been terminated for insubordination. See id. at 138:11-14. Peters informed Grado that he had "reported off work" to his immediate supervisor, Jeff Katt, because he had been sick, and that Katt had approved his absence. Id. at 138:24 to 139:4. Peters was discharged immediately and did not receive an exit interview. Peters contends that his immediate dismissal without an exit interview and investigation was against company policy. Edgar testified that

Peters should have received an exit interview and that she does not know why he did not receive one. See Edgar Depo. at 185:18-22.

Edgar stated that she did not learn that Peters was African American until Pedersen called her after the termination meeting on Tuesday, October 2, 2001. See Edgar Decl. ¶ 17 at 7-8. Pedersen stated that she did not know that Peters was African American until he walked into her office for the termination meeting on Tuesday, October 2, 2001. See Pedersen Decl. ¶ 10 at 3. The EEOC contends that both Edgar and Pedersen did have knowledge that Peters is African American based on their access to information disclosing Peters' race. See Plaintiff Equal Employment Opportunity Commission's Response in Opposition to Defendant's Motion for Summary Judgment at 14, filed March 17, 2004 (Doc. 73). Peters' personnel file contained documents that revealed that he was African American. Included in his file were two "Confidential Employee Supplemental Data Sheets" where Peters had marked his race as "black." The EEOC also contends that Edgar had direct access to information concerning employee ethnicity.

Peters contends that BCI treated him differently than other employees in similar situations. See Peters Aff. ¶ 16 at 3. According to Peters, other employees missed more days in one year than Peters missed in six and a half years. See Peters Depo. at 162:21 to 163:9. Peters missed two days in six and a half years: one with a doctor's excuse and one time when his fiancé's son was killed and he missed work to attend the funeral (the 1999 incident). See id.

The EEOC has proffered evidence that Grado treated African Americans less favorably than he treated employees of other racial groups or otherwise harbored racial bias toward African Americans. Three BCI employees submitted affidavits containing statements that Grado treated African American employees worse than he treated non-African Americans and made racial remarks

-13-

at work.  See Affidavit of James Young ¶ 6, at 2 (executed March 12, 2004); Wilson Aff. ¶¶ 5, 7, at 1-2; Affidavit of Bryan Esquibel ¶¶ 5-7, at 1-2 (executed March 12, 2004).  Katt also testified that Grado may have called Peters a "nigger."  Katt Depo. 62:19 to 65:2.  Katt also went to great lengths, however, to clarify that he was not sure that Grado actually made that statement.  See id.

The EEOC directed the Court's attention to four BCI employees that it contends were treated more favorably than Peters.  Damian Mirabal is a non-African American merchandiser who worked under Grado's supervision from December 2000 to November 2001.  Mirabal received a verbal warning for having missed work five times in a six month period.  Arturo Lopez, a Hispanic merchandiser, refused to return a page from his supervisor and was threatened with insubordination and termination.  BCI did not terminate Lopez because he did not return to work and therefore "abandoned his job."  Supplemental Declaration of Sherry Pedersen ¶ 2, at 1-2 (executed March 30, 2004).  Oran Sage was a non-African American employee who was not under Grado's direct supervision.[5]  BCI disciplined Sage for leaving the premises without his supervisor's approval.  See Deposition of Oran Sage at 36:3-18.  Monica Lovato, a Hispanic merchandiser under Grado's supervision, failed to report for work on a scheduled day off.  Lovato voluntarily terminated her employment in 2002.  See Pedersen Decl.¶ 14 at 5.

BCI contends that Peters never made any formal complaints to anyone at BCI at any time during his employment that he was subjected to discrimination based on his race.  See Peters Depo. at 87:5-16.  In his affidavit, Peters states that he complained to James Young, a BCI employee, on several occasions that he felt he was being treated differently because he was African American.  See Peters Aff. ¶ 16, at 3.  Peters brought no formal complaints of race discrimination to the attention of

_____

[5] At times, the parties also refer to Mr. Sage as "Kelly" Sage.

the Human Resources Department during his employment at BCI.  See Pedersen Decl. ¶ 8 at 3.

## SUMMARY JUDGMENT STANDARD IN EMPLOYMENT CONTEXT

Under rule 56, any party may move for summary judgment.  See Fed. R. Civ. P. 56(a) and (b).
The moving party initially carries the burden of pointing out to the trial court that there is an absence
of evidence to support the nonmoving party's case, although the moving party "need not affirmatively
negate the nonmovant's claim in order to obtain summary judgment."  Allen v. Muskogee, Oklahoma,
119 F.3d 837, 840 (10th Cir. 1997)(citing Celotex v. Catrett, 477 U.S. 317, 322-23 (1986), cert.
denied, 528 U.S. 1148 (1998)).  Once the movant has met this burden, the nonmoving party must go
beyond the pleadings and show that a genuine issue of material fact exists that would require a trial.
The nonmoving party may not avoid summary judgment by resting upon only the allegations or
denials in the pleadings.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.
1991).  The Court must grant the motion "if the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c).

In ruling on a summary judgment motion, the Court examines the factual record and all
reasonable inferences therefrom in the light most favorable to the nonmoving party.  See Allen v.
Muskogee, Oklahoma, 119 F.3d at 839-40.  The Court's role in deciding a motion for summary
judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether
there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving
party, there is no genuine issue for trial.  See Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir.

1995).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48 (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, at 93-95 (1983)). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

A claim of intentional disparate treatment based on race can survive summary judgment only when the plaintiff has presented sufficient evidence to show that there is a genuine issue of material fact whether the plaintiff's race actually motivated the allegedly discriminatory conduct. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000)("[L]iability depends on whether the protected trait . . . actually motivated the employer's decision."). "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1225 (10th Cir. 2000)(citing Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir.1999); Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir.1995)). In cases involving circumstantial evidence of discrimination, courts should apply the analysis that the Supreme Court of the United States set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

See <u>Kendrick v. Penske Transp. Services, Inc.</u>, 220 F.3d at 1225.

Under the <u>McDonnell Douglas</u> framework, the plaintiff, here the EEOC, "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802. "Once the plaintiff has established a prima facie case, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its employment action." <u>Kendrick v. Penske Transp. Services, Inc.</u>, 220 F.3d at 1226 (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802). "If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 804.

## **LEGAL ANALYSIS**

The sole claim remaining in this case is the EEOC's allegation that BCI terminated Peters' employment because of his race. It is an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Both parties agree that this case does not involve direct evidence of discrimination and that the <u>McDonnell Douglas</u> analysis applies.[6]

BCI does not dispute that the EEOC has met its burden to establish a prima facie case of discriminatory discharge. And while the EEOC disputes whether BCI has come forward with a legitimate nondiscriminatory reason for its conduct, the Court believes that BCI's burden is one of production and not of persuasion. Thus, BCI need only articulate a legitimate nondiscriminatory

---

[6] "In the absence of direct evidence of discrimination, a Title VII claimant may prove his case by inference." Response at 5. Both parties relied upon the <u>McDonnell Douglas</u> analysis in their briefs.

reason for discharging Peters.  The EEOC's arguments with respect to the legitimacy of BCI's proffered reason are more appropriately directed toward to the question of pretext.  Because the Court finds that the EEOC has not created a genuine issue of material fact with respect to the question whether BCI's stated reason for its decision is mere pretext for discrimination, the Court will grant BCI's motion for summary judgment.

## I.     THE EEOC HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATORY DISCHARGE.

In the United States Court of Appeals for the Tenth Circuit, a plaintiff must demonstrate four elements to establish a prima facie case of discriminatory discharge: (i) he belongs to a protected class; (ii) he was qualified for his job; (iii) despite his qualifications, he was discharged; and (iv) the job was not eliminated after his discharge.  See Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1229 (citing Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir.1999)).  In this case, BCI does not dispute that the EEOC satisfies these four elements.  See Memorandum in Support of Defendant's Motion for Summary Judgment at 16, filed February 19, 2004 (Doc. 66)("BCI does not dispute that Plaintiff can establish a prima facie case of discriminatory discharge.").  BCI's acknowledgment of a prima facie case means that, for purposes of this motion, the Court will accept the following elements of proof as true: (i) Peters was, at all relevant times, in a protected racial class; (ii) Peters was, at all relevant times, qualified for his position with BCI; (iii) despite Peters' qualifications, BCI discharged him; and (iv) BCI did not eliminate Peters' position after discharging him.  See Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1229.

The Tenth Circuit has stated that, when a plaintiff establishes a prima facie case under the McDonnell Douglas analysis, he or she creates "a rebuttable presumption that [the] employer

-18-

unlawfully discriminated against [the plaintiff]."  Perry v. Woodward, 199 F.3d at 1138 n.8 (citing

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)).

> When viewed against a backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors.  The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

Perry v. Woodward, 199 F.3d at 1140.  Thus, in this case, the EEOC has created a rebuttable

presumption that BCI discriminated against Peters by terminating his employment because of his race.

## II.   BCI HAS ARTICULATED A LEGITIMATE, NONDISCRIMINATORY REASON FOR TERMINATING PETERS' EMPLOYMENT.

Once a plaintiff establishes a prima facie case of racial discrimination, the burden shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its employment action.  See

Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1226.  "This burden is one of production, not

persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. at 142 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993)).  BCI can

meet this burden by offering admissible evidence sufficient for the trier of fact to conclude that it

based its decision to terminate Peters' employment on a legitimate factor other than race.  See Reeves

v. Sanderson Plumbing Products, Inc., 530 U.S. at 142 ("Respondent met this burden by offering

admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of his

failure to maintain accurate attendance records.").

BCI asserts that it terminated Peters' employment because of his insubordinate conduct

toward Grado.  See Memorandum in Support of Defendant's Motion for Summary Judgment at 16

("BCI terminated Mr. Peters for insubordination."). "[I]nsubordination could serve as a legitimate non-discriminatory reason for discharge to rebut the plaintiff's prima facie case." Brown v. Parker-Hannifin Corp., 746 F.2d 1407, 1411 (10th Cir. 1984)(citing Ray v. Safeway Stores, Inc., 614 F.2d 729, 731 (10th Cir. 1980)). Thus, BCI has satisfied its burden to articulate a legitimate, nondiscriminatory reason for the employment action that it took with respect to Peters.

The EEOC contends that BCI's proffered reason for Peters' termination fails for several reasons: (i) Peters was not actually insubordinate; (ii) BCI's claim that the decision-maker did not know Peters' race is without merit; and (iii) substantial evidence exists that Grado, rather than Edgar, was the decision-maker behind Peters' termination. See Response at 8-18. These arguments, even if accurate, do not affect BCI's ability to meet its burden to set forth a legitimate, nondiscriminatory reason for its decision.

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [termination]. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. at 254-55 (internal citations and footnotes omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253 (citations omitted). Accordingly, the Court believes that it is more appropriate to address the EEOC's arguments in a pretext analysis.

**III.    THE EEOC HAS NOT CREATED A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO THE ISSUE OF PRETEXT.**

Once the employer articulates a legitimate, nondiscriminatory explanation for its decision, the presumption of discrimination disappears.  See id. at 255 ("If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted[.]").  "[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Id. at 253.  "A plaintiff establishes pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  Equal Employment Opportunity Commission v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1198 (10th Cir. 2000)(quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir.1999)).  The EEOC has raised several arguments in an effort to create a genuine issue of material fact concerning pretext.

Three of the EEOC's arguments were mentioned above: (i) Peters was not actually insubordinate; (ii) BCI's assertion that Edgar did not know Peters' race before making her decision is without merit; and (iii) substantial evidence exists that Grado, rather than Edgar, was the decision-maker behind Peters' termination.  See Response at 8-18.  In its briefing directly addressing the pretext issue, the EEOC also argued that: (i) BCI acted contrary to a written policy when it terminated Peters; (ii) BCI acted contrary to an unwritten company policy or practice by treating similarly situated individuals of a different class differently from Peters; (iii) evidence of Grado's racial bias supports a finding of pretext; and (iv) statistical evidence concerning the racial composition of

BCI's work force supports a finding of pretext.  See id. at 18.  For the reasons stated on the record in open court during the hearing on this matter, and for the reasons set forth below, the Court finds that the EEOC has not demonstrated that there is a genuine issue of material fact that would require a trial.

**A.      NO GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER BCI'S STATED REASON FOR TERMINATING PETERS' EMPLOYMENT IS FALSE.**

The EEOC argues that BCI's proffered reason for terminating Peters' employment is a pretext for discrimination because Peters was, in fact, not insubordinate.  The EEOC maintains that, to establish that Peters was insubordinate, BCI "must articulate an occasion when Stephen Peters resisted authority, refused to obey, used objectionable language or was abusive toward a supervisor." Response at 8 (citing Webster's Third New Dictionary at 999 (1981); 48 Am. Jur. 2d Labor and Labor Relations § 2259).  The EEOC contends that BCI is unable to articulate any of these conditions.

"[D]istrict courts, when analyzing the pretext issue, do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer." Bullington v. United Airlines, Inc., 186 F.3d at 1318 n.14, overruled in part on other grounds by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  The relevant inquiry is not whether BCI's proffered reasons were "wise, fair or correct," but whether BCI "honestly believed those reasons and acted in good faith upon those beliefs." Bullington v. United Airlines, Inc., 186 F.3d at 1318 (citing Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir.1993)("Title VII is not violated by the exercise of erroneous or even illogical business judgment."); Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir.1997)("[A]rguing about the accuracy of the employer's assessment [of plaintiff's

performance] is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." (internal quotation marks and citations omitted.))).  Further, "a challenge of pretext requires [the Court] to look at the facts as they appear to the person making the decision to terminate plaintiff. "  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.

Thus, in this case, Peters' subjective belief whether he committed insubordination is not relevant.  The Court must analyze the pretext issue by determining whether a genuine issue of material fact exists whether BCI honestly believed that Peters had committed insubordination and whether that was the true reason for its decision to terminate his employment.  The EEOC has been unable to dispute, by competent evidence, that Patricia Edgar, the Employee Relations Manager responsible for deciding all termination issues, believed that Peters' conduct on Friday, standing alone, warranted termination.  See Edgar Decl.  ¶ 10, at 4 ("I made the determination on Friday, September 28, 2001, that Mr. Peters was insubordinate.").  The EEOC has also been unable to point to evidence in the record which contradicts that Edgar made the decision to terminate because she believed that Peters' conduct met BCI's definition of insubordination.  See id. ¶ 9, at 4 ("[I]nsubordination occurs when the employee knows that he is considered to be defying a direct order of the supervisor and that his conduct could lead to termination.").  It is BCI's definition of "insubordination" that controls.  Although the EEOC argues for a different definition, Tenth Circuit law states that the Court must evaluate a pretext challenge by reference to "the facts as they appear to the person making the decision to terminate plaintiff. "  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.

And while the EEOC challenges BCI's ultimate conclusion that Peters was insubordinate, it

does not challenge the facts underlying that conclusion.  In fact, Peters admitted those facts at his deposition.  Grado called Peters on Friday to discuss Peters coming in to work on Sunday and told Peters: "I'm not asking you to come to work, I'm telling you to come to work.  If you do not come to work, it could lead to insubordination and could lead to termination."  Peters Depo. at 121:11-14.  Rather than agree to come in to work on Sunday, Peters told Grado to "do what [you've] got to do, and I'll do what I['ve] got to do."  Id. at 121:23 to 122:1.  According to BCI, Peters' statement during that telephone conversation was an act of insubordination.

The EEOC argues that the Court should find a genuine issue of material fact with respect to pretext because it is unclear when Peters' insubordination, if any, occurred.  According to the EEOC, Peters could not have committed insubordination on Friday, September 28, 2001 because Grado did not order him to take any action on Friday.  The order from Grado required Peters to report to work on Sunday.  The EEOC also argues that Peters did not commit insubordination on Sunday, September 30, 2001 because he stayed home from work with Katt's permission.  The EEOC has not introduced evidence into the record, however, to contradict Edgar's stated reasons for the decision to terminate Peters' employment.

> By the end of the day Monday, October 1, 2001, I had made a final decision to terminate the employment of Stephen Peters.  This decision was based on several factors.  First and foremost was the conduct of Mr. Peters towards Mr. Grado on Friday, September 28, 2001.  There was no question in my mind that Mr. Peters had committed the offense of insubordination that day.  A single offense of insubordination is sufficient to warrant termination under BCI policy.  However, this was not Mr. Peters' first offense of insubordination.  The fact that Mr. Peters had previously been written up for insubordination and had already been given a final warning on this issue also contributed to my decision to terminate his employment.  Mr. Peters had already been given more chances than the policy required on this issue, and I felt that any action short of termination at that juncture could set a bad precedent on the issue of BCI's stance with respect to insubordination.

-24-

Edgar Decl. ¶ 13, at 6.

Thus, while the EEOC argues that insubordination did not occur on Friday, the EEOC has not provided evidence to contradict BCI's evidence that Peters engaged in the conduct that BCI attributes to him.  The EEOC's argument that BCI somehow misinterpreted that conduct is insufficient to create a genuine issue of material fact on the issue of pretext.  "[A] challenge of pretext requires [the Court] to look at the facts as they appear to the person making the decision to terminate the plaintiff."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.  There is no evidence to support the contention that BCI did not honestly believe that Peters was insubordinate on Friday.

The EEOC also argues that insubordination did not occur on Sunday because Peters missed work with Katt's permission.  It is undisputed that Peters called in sick to Katt on Saturday evening.  According to Edgar, however, that call did not justify Peters' absence or preclude a determination that Peters was insubordinate.

> The fact that Mr. Peters called in sick to Jeff Katt on Saturday night had no impact whatsoever on my assessment of the situation, for several reasons.  First, in my opinion, the timing of Mr. Peters' alleged sickness was highly suspect.  I knew that he worked his scheduled shifts on Friday, September 28, 2001 and Monday, October 1, 2001, which led me to conclude he could have come to work on Sunday if he wished to do so.  I also found it particularly suspicious that Mr. Peters chose to call in sick to Mr. Katt, rather than Mr. Grado, given the fact that Mr. Peters had been warned by Mr. Grado the day before that if he did not come to work he would be subject to termination.  In my opinion, which I formulated prior to my decision to terminate, if Mr. Peters had genuinely been sick, and unable to work, and was genuinely interested in preserving his employment relationship with BCI, he would have called in to explain the situation directly to Mr. Grado.

Edgar Decl. ¶ 14, at 6-7.  Thus, reference to Peters' Saturday evening telephone call to Katt does not create a genuine issue of material fact whether Edgar believed Peters was insubordinate on Sunday.

The EEOC argues that the Disciplinary Status Notice creates a genuine issue of material fact

-25-

whether BCI terminated Peters for failure to report to work on Sunday rather than for his conduct toward Grado on Friday.  The Notice shows a violation date of September 30, 2001 and contains the following narrative:

> Group A: Insubordination: On Friday 9-28-01 you were given a direct order to come into work on Sunday 9-30-01 due to business necessity.  I also explained how this was a direct order and failure to comply with the directive would be considered insubordination and would result in termination.  You explained how you had plans and that I "should do whatever I had to do."  You did not report to work on Sunday 9-30-01, therefore your employment is being terminated for insubordination.

Disciplinary Status Notice (September 30, 2001).  Although the Notice mentions Peters' failure to report to work on Sunday, September 30, 2001, the Court does not believe that it creates a genuine issue of material fact on the issue of pretext.  It is consistent with Edgar's declaration.

Edgar has stated that Peters' failure to report to work played a role in her decision to terminate Peters' employment.  See Edgar Decl. ¶ 14, at 6.  Edgar viewed Peters' "failure to come to work on Sunday not as an isolated attendance issue, but as the fulfillment of his stated intention the previous Friday to defy Mr. Grado's direct order."  Id.  Edgar viewed Peters' conduct on Friday and Sunday as parts of the same chain of events.  Thus, that the Notice lists Peters' conduct on Sunday, September 30, 2001 as the reason for his termination is not inconsistent with BCI's stated position and does not create a genuine issue of material fact.[7]

---

[7] The EEOC's characterization of Peters' termination as one for failure to report to work serves as the basis for its later argument that BCI treated Peters differently than other similarly situated individuals.  The EEOC has not been able to dispute, however, that BCI terminated Peters' employment because of insubordination rather than attendance violations.  See Edgar Decl. ¶ 16, at 7 ("Mr. Peters was terminated solely for insubordination.  Mr. Peters was not terminated because he did not show up for work on Sunday, except to the extent this conduct is viewed in context with his exchange with Mr. Grado on Friday, September 28, 2001, as the fulfillment of Mr. Peters stated intention to defy a direct order from Mr. Grado.").  The fact that Grado's order to Peters involved coming into work does not automatically transform Peters' violation from insubordination into an attendance violation; the attendance violation was incidental to Peters' insubordination.  Thus, Peters is not similarly situated with other employees whom BCI disciplined for violation of various

**B.     NO GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER GRADO, RATHER THAN EDGAR, MADE THE DECISION TO TERMINATE PETERS' EMPLOYMENT.**

The parties dispute whether Edgar or Grado made the decision to terminate Peters' employment.  The EEOC argues that "Edgar relied on 'facts' obtained from Grado.  Based on the 'facts' as reported by Grado, Edgar **authorized** Grado to terminate Mr. Peters."  Response at 15 (emphasis in original).  In support of its argument that Grado was the decision-maker, the EEOC also points out that it was Grado that anticipated a decision needed to be made and contacted Edgar; that Edgar did not conduct an independent investigation of the facts she received from Grado; and that Grado gave employees the impression that he had the authority to make termination decisions.

The EEOC argues that Edgar unduly relied on Grado's version of the facts because she did not perform an independent investigation into Peters' conduct.  There was no evidence, however, either before Edgar or before this Court, to raise the inference that Grado relayed misleading information to Edgar.  To the contrary, the evidence is that Peters engaged in the conduct that BCI attributes to him.

Moreover, Edgar did take some steps to more closely evaluate the situation.  She met with Pedersen by telephone to learn more information about Peters' disciplinary history.  It was during that conversation that she learned that one of Peters' former supervisors had written Peters up for insubordination in 1999 based on his refusal to work a scheduled day off.  See Edgar Decl. ¶ 11, at 5.  That Peters had a similar incident with a different supervisor contributed to Edgar's conclusion that Grado's version of events was accurate.  See id.

The EEOC produced evidence that Grado made representations in the workplace that he had

---

attendance rules.

-27-

the authority to terminate employees under his supervision.  See Katt Depo. at 72:7-13.  During his

employment with BCI, Katt assumed that Grado was the one who made decisions to terminate

employees.  See id. at 71:21 to 72:5.  Other employees also believed that Grado had the ability to fire

the individuals he supervised.  See Wilson Aff. ¶ 8, at 2-3.  Peters also testified that he believed Grado

had the authority to discipline and fire employees.  See Peters Aff. ¶ 18, at 3.

Grado's statements, however, and employees' subjective beliefs, do not create a genuine issue

of material fact whether Grado had the authority to terminate employees.  With respect to Grado's

actual authority, the evidence is undisputed.  Edgar had to authorize "all terminations."  Edgar Decl.

¶ 3, at 2 (emphasis in original).  See also Pedersen Decl. ¶ 2, at 2.  Grado did not have independent

authority to discipline or terminate employees working under his supervision.  See Grado Decl. ¶ 6,

at 3 ("All such disciplinary actions must be authorized by our Human Resources Department.  It is

my responsibility to deliver or communicate all disciplinary actions -- whether verbal or written -- to

employees working under my supervision.").  When an employee had an attendance, performance,

or disciplinary issue, Grado brought those facts to the attention of the Human Resources Department,

which would in turn decide which company polices applied to the situation and the appropriate action

to take under the circumstances.  See id.[8]

BCI has produced admissible evidence that Edgar was the final decision making authority on

terminations generally.  See Edgar Decl. ¶ 3, at 2; Pedersen Decl. ¶ 2, at 2.  It has also produced

---

[8] The EEOC also brings Grado's training in discipline to the Court's attention.  See Response at 16
n. 3 ("Moreover, Cesar Grado was required to attend training on "discipline and dismissal decisions," and
a supervisor's "role in discipline.")(emphasis in original).  That Grado participated in such training, however,
does not create a genuine issue of material fact whether Grado was the decision-maker behind Peters'
termination.  It is logical that Grado would attend such training because he is the supervisor who must use
professional judgment in determining whether to bring certain conduct to the Human Resources Department's
attention.

competent evidence that Edgar was the decision-maker specifically with respect to Peters' termination.  See Edgar Decl. ¶ 15, at 7 ("I was solely responsible for making the decision to terminate Mr. Peters' employment.  At no point during my meetings with Mr. Grado did I ask -- or did Mr. Grado offer -- an opinion or recommendation as to what should be done with Mr. Peters.").  See also Grado Decl. ¶ 13, at 5 ("During these conversations, I simply reported the facts to Ms. Edgar and gave no opinion or recommendation as to what I thought should happen to Mr. Peters.").

In response to the evidence that Edgar, rather than Grado, made the final decision to terminate Peters' employment, the EEOC argues that "a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent."  Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1231.[9]  Edgar, however, did not act as a "rubber stamp" or "cat's paw" for Grado's prejudice.  The EEOC does not dispute with any competent evidence that Grado did not express an opinion or recommendation to Edgar about what he thought BCI should do about Peters. See Grado Decl. ¶ 13, at 5.

Cases in which other circuits have recognized this "rubber stamp" theory involved situations in which a decision-maker accepted the *recommendations* of a biased supervisor without conducting an independent investigation.  See e.g., Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996)("If, on the other hand, Aguero did not conduct his own independent investigation, and instead

---

[9] Although the EEOC cites Kendrick v. Penske Transp. Services, Inc. for this proposition, the Court notes that Kendrick does not say that the Tenth Circuit accepts that test.  It only says that "[o]ther circuits have recognized" that test and then explains why it failed to assist the plaintiff in Kendrick.  Similarly, while this Court does not decide the appropriateness of the test, it does not believe that the test assists the EEOC in establishing a genuine issue of material fact on pretext.

merely 'rubber stamped' the recommendations of Clark and Kelley, the causal link between Long and Reavis's protected activities and their subsequent terminations would remain intact."); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990)("Lehnst not only set up Shager to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying Shager's performance to the committee in the worst possible light.  Lehnst's influence may well have been decisive.  The committee's deliberations on the question whether to fire Shager were brief, perhaps perfunctory; no member who was deposed could remember having considered the issue.").  In this case, Grado did not make any recommendations to Edgar.  Furthermore, Edgar attempted to do at least some independent investigation by consulting with Pedersen regarding Peters' disciplinary history.

Even if the Court were to analyze this case under the "rubber stamp" theory, the EEOC has not directed the Court's attention to any evidence in the record linking Grado's potential bias to his decision to involve Edgar in the situation with Peters.  The EEOC has not presented evidence that Grado would not have called Edgar if Peters was Anglo or Hispanic.  It is undisputed that Grado believed he needed to consult Human Resources and that Pedersen was unavailable.

The only arguably similar incident involved another merchandiser, Monica Lovato, not reporting to work on a day off as requested.  See Katt Depo. at 118:1 to119:23.  Because that situation was different in two significant ways, the Court does not believe that Grado's failure to contact Human Resources in Lovato's situation supports an inference that he makes such decisions based on the employee's race.  First, unlike Peters, Lovato did not refuse to work the day off as requested, but rather agreed to work and then failed to report to work.  Second, once Lovato failed to report to work, her violation was an attendance violation rather than insubordination.

Evidence of Grado's racial bias and comments, standing alone, is insufficient to support an inference that he made the decision to contact Edgar because of Peters' race.  Although the Court finds that Grado was not the decision-maker in this case, case law discussing racial bias on the part of a decision-maker is informative on this area of proof.  "Although [racial] comments may serve as circumstantial evidence of discrimination, the plaintiff must still show some nexus between the statements and the defendant's decision to terminate the employee.  Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." Shorter v. ICG Holdings, Inc., 188 F.3d at 1209-10 (citations and internal quotation marks omitted).  Thus, if the EEOC were attempting to show that Grado improperly influenced or initiated Peters' termination, it would need to demonstrate some causal connection between his racial bias and his decision to involve Edgar.  The EEOC has not presented such evidence.

Finally, the EEOC argues that there is a genuine issue of material fact whether Grado was the decision-maker because the Disciplinary Status Notice BCI issued to Peters at the time of his termination does not identify Edgar as the decision-maker, and BCI did not identify Edgar as the decision-maker during administrative proceedings.  The Court does not believe that these omissions create a genuine issue of material fact whether Grado was the decision-maker because they are not inconsistent with the evidence BCI has produced in favor of summary judgment.  Grado stated that it is his responsibility to "deliver or communicate all disciplinary actions . . . to employees working under [his] supervision."  Grado Decl. ¶ 6, at 3.

## C.   NO GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER PETERS' RACE PLAYED A ROLE IN THE DECISION TO TERMINATE HIS EMPLOYMENT.

Grado knew that Peters was African American.  Because the Court has found, however, that

-31-

the record shows that Grado did not make the decision to terminate Peters' employment, it is necessary to examine whether the actual decision-maker knew of Peters' race and possessed any racially discriminatory motivation.  The EEOC raises two arguments in an effort to create a genuine issue of material fact on this issue.  First, the EEOC argues that Edgar had knowledge of Peters' race because she had access to documents containing that information.  Second, the EEOC argues that other BCI management officials who acted in concert with Edgar had knowledge that Peters is African American.

Neither of the EEOC's arguments assumes that Edgar had actual knowledge of Peters' race.  The EEOC's first argument attempts to impute knowledge to Edgar because she had the ability to discover the information if she chose to do so.  The EEOC contends that documents disclosing Peters' race were available to Edgar through Peters' personnel file, which Pedersen reviewed in Albuquerque and discussed with Edgar.  These documents, however, were located in Albuquerque, not Phoenix.  The EEOC also asserts that Edgar also could have learned of Peters' race by accessing information that BCI maintains as part of its Human Resources management.

The EEOC's argument does not create a genuine issue of material fact because, although it establishes that Edgar had the opportunity to learn Peters' race, there is no evidence that she availed herself of that opportunity.   It is undisputed that Edgar worked in Phoenix, rather in than Albuquerque, and that she did not meet Peters before she made the decision to terminate him.  See Edgar Decl. ¶ 18, at 8.  Her communications with Grado and Pedersen were all by telephone. Further, there is no evidence to contradict Edgar's sworn testimony that she did not know that Peters was African American until after the termination.  See id. ¶ 17-18, at 7-8 ("Race played no part whatsoever in my decision to terminate the employment of Stephen Peters.  I did not even know he

was African American when I made the decision to terminate his employment."). She was not present when Grado told Peters that BCI had terminated him.

The EEOC's second argument also does not create a genuine issue of material fact that BCI's stated reason for terminating Peters' employment was pretextual. The EEOC points out that other BCI management officials in Albuquerque, who were directly involved in Peters' termination, were aware that he is African American. Grado, Pedersen, and Bateluna were each present during the meeting when Grado informed Peters of the termination. The EEOC contends that each of those three people knew that Peters was African American. The Court cannot attribute this knowledge to Edgar, however, because there is no evidence that any of those three people conveyed their knowledge of Peters' race to Edgar. Edgar's sworn testimony is that she did not know Peters' race.

Pedersen testified that she did not realize that Peters was African American until he entered the meeting where Grado announced the termination. See Pedersen Decl. ¶¶ 9-10, at 3. There is no evidence to contradict that assertion. If Pedersen learned of Peters' race at the time of the termination, there was no basis for her to attempt to change Edgar's decision merely because of Peters' race. Edgar made the decision based on other factors and any new information concerning race was irrelevant.

The EEOC also argues that Grado's knowledge of Peters' race creates a genuine issue of material fact on pretext. Grado was the supervisor who decided to seek guidance from Edgar on Friday, September 28, 2001. The EEOC contends that this decision was the "first and most critical decision made concerning Peters' termination." Response at 15. The Court assumes that the EEOC believes Grado's decision to involve Edgar was critical because the EEOC also argues that Grado was biased against African Americans. According to the EEOC, it was this alleged racial bias that

motivated Grado to initiate the process of Peters' termination.

The Court believes that the EEOC has created a genuine issue of fact whether Grado was biased against African Americans. It has introduced the affidavits of several employees, including Peters, who believe that Grado treated African Americans less favorably than he treated employees of other races. The Court does not believe, however, that this issue is material. The record shows that Edgar, not Grado, made the determination that Peters was insubordinate and was the decision-maker behind Peters' termination. There is no evidence that Grado communicated his racial bias to Edgar. Edgar did not know that Peters was African American and did not receive any recommendation from Grado as to how to discipline Peters. Furthermore, there is no evidence that the information Grado communicated to Edgar, and on which Edgar relied to make her decision, was false.

Accordingly, the Court does not believe that Grado's, Pedersen's, and Bateluna's knowledge of Peters' race creates a genuine issue of material fact whether BCI's stated reason for terminating Peters' employment was a pretext for discrimination. Also, the EEOC has not created a genuine issue of material fact whether Edgar knew Peters' race. Aside from the arguments of counsel, there is nothing before the Court to support the inference that Edgar knew Peters is African American.[10] If the Court were to allow this case to proceed to a jury, and the evidence was what it is in the record, the Court would still be confronted with a situation in which the decision-maker did not know the race of the employee.

---

[10] The EEOC also argues that statistical evidence concerning the racial composition of BCI's work force supports a finding of pretext. In April 2002, only three of the 200 employees in BCI's Albuquerque facility were African American. See Current Albuquerque Employee Roll (dated April 24, 2002). The Court does not believe that this fact, under the circumstances present in this case, is sufficient to create a genuine issue of material fact on the issue of pretext, and the EEOC does not explain how it does.

**D.   NO GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER BCI ACTED CONTRARY TO AN UNWRITTEN COMPANY POLICY BY TREATING SIMILARLY SITUATED INDIVIDUALS DIFFERENTLY THAN IT TREATED PETERS.**[11]

The EEOC also argues that the Court should find a genuine issue of material fact on the issue of pretext because BCI treated Peters differently than other similarly situated individuals of different racial classes. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" Kendrick v. Penske Transp. Services, Inc., 220 F.3d at 1232 (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)). "The burden is on the plaintiff to demonstrate he is similarly situated to the employees to whom he is comparing himself." Kelley v. Goodyear Tire and Rubber Co., 220 F.3d 1174, 1178 (10th Cir. 2000)(citing Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 532 (10th Cir.1994)).

The EEOC identifies four individuals that it alleges committed rule violations of comparable seriousness to Peters: (i) Arturo Lopez; (ii) Monica Lovato; (iii) Damian Mirabal; and (iv) Oran Sage. With respect to each individual, however, there is some differentiating or mitigating circumstance that distinguishes him or her from Peters. For example, Sage was not a merchandiser and did not report to Grado. Sage failed to follow his supervisor's order to reload his truck and take out a delivery, then left the premises without his supervisor's permission. See Pedersen Decl. ¶ 15, at 5. Pedersen determined that, although Sage had violated company policy, he had not committed insubordination

---

[11] The EEOC also alleges that BCI acted contrary to its written policies when it terminated Peters' employment. For example, BCI did not provide Peters with an exit interview after his termination. This fact, however, does not create a genuine issue of material fact whether BCI's stated reason for the termination was pretextual. Edgar made the decision to terminate Peters' employment without knowledge of his race. The lack of an exit interview does not change that undisputed fact.

because there was no evidence to suggest that his supervisor had told him that his conduct was insubordination and could lead to termination. See id. Accordingly, Pedersen gave Sage a written warning for a Group B violation and suspended him without pay for three days. See id.

Damian Mirabal had attendance and work performance issues. Mirabal received progressive discipline addressing these Group C violations, and BCI ultimately terminated him for unsatisfactory performance. See id. ¶ 13, at 4. Mirabal did not refuse to obey a direct order, and Grado did not tell Mirabal that his conduct was insubordinate. See Grado Decl. ¶ 17, at 7. Other than Peters, Grado states that he has "never had a situation where an employee refused a direct order, and, after being told his conduct was insubordinate and that he could be fired, told [him] to 'do what [he has] to do.'" Id. ¶ 18, at 7.

Like Mirabal, Lopez also had performance and attendance issues, and also received progressive discipline. See id. ¶ 17, at 6-7. There was one incident involving Lopez that the EEOC argues is comparable to Peters' situation. On Lopez' last day of employment with BCI, he refused to return pages both from Katt and from Grado. Grado then sent Lopez a text message telling him that if he refused to return the page he may be terminated. See id. ¶ 19, at 7. Lopez did not return the page, but also did not return to work at BCI. See id. Thus, because Lopez was no longer with the company, Grado did not bring his insubordination to Pedersen's or Edgar's attention. See id. And, if Lopez had returned to work, Grado would have reported his behavior just as he did in Peters' case. See id.

Lovato's conduct also involves attendance violations rather than insubordination. She did not have any disciplinary problems during her employment. See Pedersen Decl. ¶ 14, at 5. She did not refuse a direct order from Grado, and Grado did not tell her that her conduct was insubordinate and

-36-

could lead to termination.  See Grado Decl. ¶ 20, at 8.  Any rule violations that Lovato may have

committed were attendance violations that were not subject to immediate termination.

These individuals are not similarly situated to Peters because they all committed attendance

violations.  Peters, on the other hand, did not.

> Mr. Peters was terminated solely for insubordination.  Mr. Peters was not terminated
> for performance issues.  Mr. Peters was not terminated for attendance violations.  Mr.
> Peters was not terminated because he called in sick to Mr. Katt instead of Mr. Grado.
> Mr. Peters was not terminated because he did not show up for work on Sunday,
> except to the extent this conduct is viewed in context with his exchange with Mr.
> Grado on Friday, September 28, 2001, as the fulfillment of Mr. Peters' stated
> intention to defy a direct order from Mr. Grado.

Edgar Decl. ¶ 16, at 7.  Because the conduct of the other employees did not rise to the level of

insubordination, the EEOC cannot compare their conduct with that of Peters.  Accordingly, the Court

finds that the EEOC has not established that a genuine issue of material fact exists with respect to

pretext, and the Court will grant BCI's motion for summary judgment.[12]

## CONCLUSION

Although there is evidence in the record that Grado may have harbored racial bias against

African Americans, there is no evidence to suggest that such bias influenced Edgar's decision to

terminate Peters' employment.  The EEOC has not presented evidence to suggest that Grado would

not have contacted Edgar regarding the situation if Peters had been Anglo or Hispanic.  Grado

relayed accurate information to Edgar about Peters' conduct, and Edgar then independently made the

decision to terminate Peters without any recommendation from Grado.  And while Grado may have

had the authority to recommend discipline, the undisputed evidence in the record is that he did not

---

[12] Because the Court finds that there is no genuine issue of material fact whether BCI intentionally discriminated against Peters on the basis of his race, it is unnecessary to address the EEOC's request for injunctive relief.

make any recommendations to Edgar.  In addition to the information she received from Grado,

Edgar's decision included consideration of Peters' 1999 incident of insubordination with a different

supervisor.  Edgar did not know that Peters was African American at the time she made the decision

to terminate him.  Accordingly, there is no evidence that racial animus motivated BCI's termination

of Peters.

      **IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted and all

claims against BCI are dismissed with prejudice.


_____
UNITED STATES DISTRICT JUDGE


Counsel:

Mary Jo O'Neill
C. Emanuel Smith
Equal Employment Opportunity Commission
Phoenix District Office
Phoenix, Arizona

-and-

Veronica A. Molina
Loretta F. Medina
Equal Employment Opportunity Commission
Albuquerque District Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

E. Todd Presnell
Kara E. Shea
Miller & Martin, LLP
Nashville, Tennessee

-and-

Christopher M. Moody
Moody & Warner, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*